# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

In the Matter of Kimberly L. Smith, Respondent.

Appellate Case No. 2020-000493

Opinion No. 27999
Submitted September 4, 2020 – Filed October 7, 2020

## DISBARRED

John S. Nichols, Disciplinary Counsel, and Julie K.
Martino, Assistant Disciplinary Counsel, both of
Columbia, for the Office of Disciplinary Counsel.

Respondent, of Beaufort, *pro se*.

**PER CURIAM:**   In this attorney disciplinary matter, Respondent and the Office
of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by
Consent (the Agreement), pursuant to Rule 21, RLDE, Rule 413, SCACR.  In the
Agreement, Respondent admits misconduct and consents to the imposition of a
definite suspension of one to three years or disbarment.  Respondent also agrees to
pay the costs incurred in the investigation and prosecution of this matter by ODC
and the Commission on Lawyer Conduct (the Commission) within thirty (30) days
of the imposition of discipline.  We accept the Agreement and disbar Respondent
from the practice of law in this state.  The facts, as set forth in the Agreement, are
as follows.

## Facts

*Matter I*

On March 28, 2009, KG, a resident of Syracuse, New York, was a passenger in a
car traveling through Sea Pines Resort in Beaufort when a tree fell on the car.  KG
was injured and, in May 2009, she contacted the South Carolina law firm of Moss,
Kuhn & Fleming to represent her in a personal injury lawsuit.  KG signed a

representation agreement with the firm in August 2009, and the firm assigned the case to Respondent.

Because KG lived in New York, she and Respondent communicated through telephone conversations and emails for several months. Respondent filed suit on behalf of KG on March 26, 2012, with two days remaining on the statute of limitations. Because Respondent failed to properly name all defendants in the suit, only one of the four defendants (SPCC) answered the complaint. Respondent failed to respond to SPCC's interrogatories, resulting in SPCC filing a motion to dismiss the case for failure to prosecute and a motion for summary judgment.

A hearing on the motion for summary judgment was scheduled for September 4, 2013, but was continued to allow for KG's deposition. During the following months, KG experienced repeated problems making contact with and receiving follow-up communications from Respondent. On September 10, 2013, KG traveled from New York to Beaufort to be deposed. The day after her deposition, KG traveled back home and repeatedly tried to contact Respondent to ask how Respondent thought the deposition went and what KG should expect going forward. Respondent did not respond.

On September 30, 2013, Judge Craig Brown held a hearing on SPCC's motion for summary judgment. Respondent was present at the hearing but did not inform KG of the hearing before or after it occurred. Respondent ignored KG's repeated requests for information regarding her case and the potential trial.

On October 22, 2013, Judge Brown granted SPCC's motion for summary judgment and dismissed the case with prejudice. On October 25, 2013, the Beaufort County Clerk of Court emailed the order granting summary judgment to SPCC's counsel and Respondent. Respondent did not send the order to, call, email, or contact KG in any way to inform her about the decision.

Throughout 2014, KG attempted to contact Respondent about her case. In March 2014, Respondent met in-person with KG in Hilton Head, but she did not tell KG the case had been dismissed. Instead, Respondent told KG the case was moving forward. At some point, Respondent told KG the case would be called for trial the week of November 10, 2014, and set up a time with KG for a phone call. Respondent later canceled the call, claiming she was in a deposition. In late October and early November 2014, KG contacted Respondent five times to discuss the supposed upcoming trial. Respondent told KG there were problems setting a trial date and did not tell KG the case had been dismissed a year earlier.

During November 2014, KG sent Respondent five more emails requesting an update. Respondent claimed she was in discussions with Judge Carmen Mullen[1] and in a double murder trial, but she promised she would contact KG as soon as possible.

KG emailed and called Respondent or her office various times in early 2015. On the occasions Respondent responded to KG, she continued to claim the case was proceeding and led KG to believe she would testify during trial via Skype. In May 2015, KG again asked Respondent about the trial. Respondent told KG the trial would begin that same week, and she would keep KG updated. The day the trial supposedly began, Respondent emailed KG to tell her the trial would probably be over the next day and that she would call KG when the trial ended. The next day, Respondent texted KG and told her the trial was continued to the following week because Judge Mullen had an emergency hearing in another case.

The following week, Respondent told KG the trial went well and Judge Mullen would rule by the end of the week. KG emailed Respondent the following day noting how stressful the case had been and thanking Respondent for her reassurances.

On June 4, 5, 8, 9, and 10, 2015, KG emailed Respondent about her case. Respondent told KG there was no news but she should remain positive. Throughout the rest of June, KG emailed Respondent several times asking whether Judge Mullen had ruled. Respondent made several promises to call KG but did not do so, repeatedly claiming she was in a trial or mediation.

In July 2015, Respondent emailed KG, told her Judge Mullen had ruled, and told her she would call KG as soon as she left the courthouse. Respondent apparently did not call KG as promised because, three weeks later, KG asked Respondent if Judge Mullen had ruled. Respondent responded a few days later, telling KG she had been out of the country but that she had a conference scheduled with Judge Mullen the following morning. KG responded she would be waiting to hear from Respondent.

Throughout August and September 2015, KG continued to ask Respondent for updates but was repeatedly put off by Respondent, who claimed to be in depositions, unexpectedly away from work, or waiting for word from Judge

[1] Respondent claimed KG's case had been assigned to Judge Mullen.

Mullen. At this point, the case had been dismissed for almost two years.

In November 2015, December 2015, and early January 2016, KG repeatedly contacted Respondent about her case. KG told Respondent she was going through a divorce and a potential settlement from the case could affect her soon-to-be ex-husband. On January 11, 2016, a paralegal from a New York law firm called Respondent on KG's behalf.[2] The paralegal told Respondent KG had heard nothing from Respondent in over two months despite KG's repeated requests for information about her case.

KG emailed Respondent in February 2016, noting she had tried unsuccessfully to reach Respondent several times and conveying her frustration about the delay in resolving her case. Respondent told KG she would call, but she did not call. KG contacted Respondent again and asked if Respondent had forgotten to call. Respondent emailed KG and told KG she had lost her voice but would call the next morning.

Approximately two weeks later, KG sent a lengthy email to Respondent expressing exasperation about how long the case had been going on and how stressful it was to her. In a responding email, Respondent claimed she was out of work with the flu, thanked KG for her patience, and asked when would be a good time for Respondent to call her. Although they apparently scheduled a phone call, Respondent failed to call KG.

In early March 2016, Respondent put off KG's repeated requests for contact, claiming she was taking a friend to the hospital and, later, flying out of town. In early April, Respondent told KG she had "[s]o much to tell" KG but postponed a scheduled call, claiming she had a sinus headache.

Around this time, KG began including her friend and financial adviser (BS) in her emails and telephone communications with Respondent. After another series of rescheduled appointments, the three women held a conference call. BS sent a follow-up email to Respondent and KG summarizing the conference call as follows: Respondent informed KG and BS Judge Mullen had yet to determine which defendant would be held liable to KG; Respondent "got the sense that the judge was near making her decision"; Respondent thought the decision would be announced April 15, 2016; and Respondent would follow up with KG and BS.

---

[2] The paralegal worked for KG's New York attorney. The New York attorney remained associated with the case after KG hired Respondent in South Carolina.

However, in the following days, Respondent continued to reschedule phone calls, claiming she was behind on appointments or unexpectedly covering court appearances.

Respondent subsequently contacted KG and BS and told them she would meet with Judge Mullen in chambers on May 3, 2016, and the "responsible party will be determined as well as the amount of settlement." KG and BS said they would call Respondent at 4:30 p.m. on May 3, 2016, to learn the results. However, twenty-six minutes before the scheduled call, Respondent emailed, claiming she was still at the courthouse. The call was rescheduled for the following day. Of course, none of the statements made by Respondent about meeting with Judge Mullen were true, as the case had been dismissed almost three years before.

During the rescheduled call, Respondent claimed Judge Mullen indicated she was inclined to find SPCC responsible for KG's injuries and reject SPCC's defense. Respondent indicated she felt optimistic Judge Mullen would rule in favor of KG, but she believed an additional hearing might be necessary to determine KG's damages. Respondent further claimed SPCC's counsel submitted additional case law, and she claimed Judge Mullen advised she would consider the case law and resume her meeting with the attorneys via conference call on Friday, May 6, 2016, at 10:00 a.m. KG and BS said they would call Respondent to hear the results of the conference call at noon on May 6, 2016. Respondent's statements about activity in the case were complete falsehoods.

On May 6, 2016, Respondent emailed KG and BS and claimed the conference call with Judge Mullen was rescheduled for the following Monday, but Respondent provided no explanation as to why. According to BS's notes, during the rescheduled call, Respondent claimed Judge Mullen ruled SPCC was responsible for KG's accident, SPCC's counsel had ten days to file a motion to reconsider, Judge Mullen would likely rule on that motion within a week, and Judge Mullen's clerk would contact the parties with the final decision. Respondent further claimed that, after she received the ruling on the motion, Respondent would contact an economist to calculate the monetary impact of the accident on KG. Respondent told KG and BS that KG's $120,000 in medical costs would be multiplied by three and the economist's calculations would be added to that number. Respondent explained KG would likely receive the settlement in mid- to late August, with KG receiving two-thirds of the total settlement amount, and Respondent's firm receiving the remaining third and compensating the referring attorney in New York. All of Respondent's statements were false.

In late May, BS recapped another conversation between the three women during which Respondent claimed SPCC's counsel had filed a motion to reconsider, but Judge Mullen was out of the country and had not ruled on the motion.  Respondent stated she expected a ruling soon, and Respondent, KG, and BS scheduled a conference call for June 1, 2016.  Again, Respondent's statements were false.

During the June 1, 2016 conference call, Respondent stated she expected a decision from Judge Mullen within twenty days and promised to email KG and BS on June 13, 2016.  When Respondent failed to do so, KG and BS attempted to contact her.  Respondent claimed she had been out of town and would be in trial the next week and asked if they could talk on a later date.  However, on the scheduled day, Respondent emailed KG and BS, claiming she was still in a trial, had been informed there would be a decision in KG's case on Monday, and would contact KG and BS on Tuesday.

During a June 29, 2016 conference call, Respondent told KG and BS a conference had been scheduled with Judge Mullen and SPCC's counsel two days prior but claimed opposing counsel had a conflict and the conference did not occur.  Respondent claimed the conference was rescheduled for July 1, 2016, but, "unofficially," Respondent "spoke to Judge Mullen and she feels this is now a formality."  The group scheduled another call for July 8, 2016.  Respondent also stated she spoke to the economist and, once he was "officially engaged," he would give an estimate for the completion of his work.  Respondent claimed that, after she received the economist's assessment, she would submit it to the court and SPCC's counsel.  Because the case had been dismissed in October 2013, none of this was true.

KG expressed concern the case would continue for another seven years and asked if Respondent could request additional help with the case.  Respondent stated that there were only four attorneys in her firm and one was ill.

In early July 2016, Respondent missed a scheduled call with KG and BS, claiming she had to undergo a medical procedure.  Respondent missed another call, claiming she was tied up in a mediation conference.  In mid-July, Respondent told KG and BS she expected to hear from the economist the following week, and she represented to KG and BS she would schedule a trial for mid-August.  However, she later emailed KG and BS, claiming she had a medical scan and needed to discuss treatment options with her doctor, after which she would have a better idea about scheduling her court appearances.

At the end of July 2016, KG emailed Respondent noting the numerous times Respondent had canceled scheduled phone calls and failed to respond to emails, and noting Respondent had yet to inform her of the economist's findings. KG told Respondent she was "extremely frustrated" and the stress the situation was putting her under was "unacceptable."

In early August 2016, KG faxed a letter to Fred Kuhn, one of the partners at Respondent's firm, expressing her frustration with Respondent, noting Respondent's litany of excuses, and asking why her case remained unresolved. KG told Kuhn the case was decided in her favor a year earlier but damages remained undetermined. KG asked Kuhn to reassign her case to another attorney in the firm.

In a follow-up email to Kuhn, KG copied James Moss, another partner at the firm. In response to this email, Moss told KG he would review her file and provide her with an update. That same day, Kuhn emailed KG and BS and confirmed Moss would review the file and provide an update.

Kuhn later emailed KG and BS, copying his paralegal and Moss—but not Respondent—stating, "[Respondent] is back in the office and I understand that she is going to directly contact [KG] in the near future." BS replied, stating, "[Respondent] is the problem. [KG] made it very clear that she wants her case reassigned."

After several more emails, a telephone conference was scheduled with Kuhn, KG, and BS. During the call, Kuhn informed KG and BS his review of court records indicated the case ended in January 2014, when Judge Brown's amended Form 4 Order was filed. Kuhn called KG a few days later to confirm the case was indeed dismissed in October 2013.

### *Matter II*

In fall 2014, TR met with Respondent about a potential lawsuit against his son (Son) for breach of contract. TR met with Respondent several times, and Respondent led TR to believe the possibility of recovery was strong. After their first few meetings, TR asked Respondent what their fee arrangement would be. Respondent told TR her firm would receive 33.3% of any settlement but that no contract regarding the representation was necessary at that point.

Respondent told TR she served Son with the summons and complaint but, because Son did not answer, she had to serve Son a second time. These statements were

false, because Respondent never filed suit on TR's behalf. TR asked Respondent several times for proof of service on Son, but Respondent never provided TR with proof of service.

TR and Respondent met several more times and spoke on the phone. Respondent falsely told TR a court date was scheduled for December 15, 2016. A few days before December 15, TR called Moss, Kuhn & Fleming to get instructions regarding the trial. During this call, TR was told by firm personnel Respondent no longer worked at the firm and the firm could not find a file for TR's case.

### Matter III

In 2010, SH hired Respondent to represent her in a medical malpractice action. Over the following years, Respondent told SH she was waiting to hear from a doctor or that the case was close to being resolved, but Respondent never provided SH with details. At the beginning of the representation, SH had frequent contact with Respondent, and Respondent led SH to believe the case was going well and the lawsuit was progressing. As time passed, SH heard from Respondent less frequently and began having trouble reaching Respondent and getting updates about her case.

For years, SH believed the case was proceeding; however, in July 2015, Respondent told SH the judge had dismissed the case but she would appeal the decision. SH believed Respondent was pursuing the appeal but never heard from Respondent again. In February 2017, Moss, Kuhn & Fleming notified SH Respondent had not attended any court hearings on her behalf and no lawsuit had been filed.

### Matter IV

In February 2012, KP reported to the Beaufort County Sheriff's Office that her vehicle had been stolen. KP later learned Title Max of South Carolina (Title Max) repossessed the vehicle based on what Title Max asserted was KP's non-payment of her loan. Title Max then sold the vehicle. KP believed the repossession was illegal because she had a title to the vehicle showing Title Max released the lien in October 2011. KP hired Attorney A to represent her in a lawsuit against Title Max. Because bankruptcy was the primary focus of Attorney A's practice, he asked Respondent to join the representation.

In the same pattern described in *Matters I*, *II*, and *III* above, problems arose as

soon as Respondent became involved in the case. From 2013 through 2018, Respondent told KP and Attorney A the case was progressing. Respondent claimed to have filed suit, but no suit was ever filed. Respondent repeatedly scheduled meetings with KP she did not appear for and failed to respond to numerous phone calls and emails from KP. Respondent lied to KP and claimed there was still time on the statute of limitations, when, in fact, the statute of limitations had expired a year earlier. Despite knowing the statute had expired, Respondent repeatedly lied to KP about the progress and status of the case, telling KP she was working hard on the matter, speaking to witnesses, and having discussions with Judge Mullen, to whom Respondent falsely claimed KP's case was assigned.

In October 2017, KP texted Respondent and asked about some money Respondent had previously loaned her. KP asked if the money had come "out of Respondent's pocket or from somewhere else," and asked if she could get more to help her get back on her feet. Respondent told KP Title Max had agreed to pay and would have money at the courthouse the following Friday. Of course, that statement was false.

In late October 2017, Respondent sent a text message to KP saying she could give KP $100. In early November 2017, Respondent sent another text message to KP saying she was trying to "move some things around" so she could loan KP "some money." Sometime later that month, Respondent messaged KP she would be paid the following day and would have some money for KP to help her out for the rest of the year.

Respondent testified during an interview with ODC that she loaned KP approximately $500. KP alleged Respondent loaned her $300. No writing existed confirming the terms of the loan, and KP never paid Respondent back. In December 2017, Respondent asked KP her shoe size and later brought her several pairs of shoes and gave her a bag full of clothes.

Also in December 2017, KP and Respondent exchanged several text messages regarding a "light pole case."[3] In these messages, Respondent told KP she would

---

[3] In 2017, KP asked Respondent to help her with a second matter. While replacing KP's mother's trailer that had been destroyed in a storm, the pole supporting the electric lines for the trailer was damaged when a truck hit the pole. KP paid to repair the pole and wanted to recover the cost of repairs from the company that owned the truck that hit the pole. Respondent agreed to help KP.

bring "it" to her and that KP needed to sign something in connection with the case. Respondent made several promises to bring the paperwork to KP, but canceled each time, claiming she had a personal health reason or was due in court.

In February 2018, Respondent scheduled a meeting with KP about the Title Max case; however, Respondent later sent a message saying she did not feel well and could not meet. That same day, KP emailed Respondent and Attorney A, said she was confused about the representation, and requested an update about her case. Attorney A responded to KP that Respondent told him she had filed suit. Attorney A further stated when he told Respondent he could not find the case in the county public index, Respondent told him she had filed the case in federal court.

In mid-February 2018, KP emailed Respondent and Attorney A and asked Respondent to provide her with the case number, status, and disposition of the Title Max case. KP also texted Respondent individually and asked for the case number. Respondent never sent this information to KP because Respondent never filed suit.

Attorney A emailed both Respondent and KP, explaining he was not the attorney of record in any proceedings for KP and noting he had not received any filed pleadings in the case even though he had prepared drafts several years earlier and had given those drafts to Respondent when he transferred the case to her. Attorney A stated that when he communicated with Respondent over the last few years on an informal basis on KP's behalf, Respondent claimed she filed the lawsuit, and he believed the case was removed to federal court. Respondent responded solely to KP and suggested they meet.

In late February 2018, KP emailed Attorney A and Respondent. She thanked Attorney A for his earlier email. Addressing Respondent, KP stated she was not interested in any more canceled meetings or small talk, again requested copies of the filed pleadings, and stated she had searched "the Beaufort, Charleston, and Columbia websites" and found no record of her case.

Attorney A emailed both KP and Respondent and told Respondent she could talk

---

In a May 2017 text message, Respondent told KP, "Should have check to fix pole by Friday. I am going to call and verify that with the defendant this afternoon." Nevertheless, in October 2017, Respondent told KP in text message that she had secured a court date for the "light pole case." However, Respondent never filed suit, there was never any court date, and KP never received any compensation in the matter.

to him about the case. Attorney A stated he, too, had searched online and had found no case filed for KP, told Respondent she owed KP an explanation, and offered to act as a liaison. In response, Respondent told Attorney A and KP she was in a kidnapping trial in Beaufort but she would get in touch with them later.

KP emailed Respondent in a "final attempt" to have Respondent turn over her file no later than February 26, 2018. Later the same morning, KP emailed Respondent again to reiterate she expected her file by Monday, February 26, 2018.

KP filed a complaint with ODC on March 2, 2018, and provided hundreds of text messages and emails showing numerous missed and rescheduled meetings. Respondent's excuses included she had court, meetings, the flu, sinus infections, a popped hip, vomiting episodes, stomach issues, personal family issues, migraines, physical therapy, strep throat, and more. KP told ODC that, on many occasions, when she asked for updates on the Title Max case, Respondent would set up a meeting, she and Respondent would meet, but Respondent only wanted to chat and gossip about things happening on the islands around Beaufort. KP stated, when she pressed Respondent for information about her Title Max case, Respondent would tell her everything was fine and the case was moving forward, or that she still had to interview a few more people.

KP also provided ODC with a set of interrogatories in the Title Max matter Respondent sent to KP asking her to provide the necessary information so Respondent could answer the interrogatories. KP did not remember the date Respondent sent the document to her, but KP answered all the questions and hand delivered her responses to Moss, Kuhn & Fleming. However, because the Title Max suit was never filed, no defendant ever sent interrogatories to Respondent.

## Law

Respondent admits her conduct violated Rules 1.1 (competence); 1.3 (diligence); 1.4 (communication); 1.5(b) (requiring the scope of representation and the basis or rate of the fee and expenses for which the client will be responsible to be communicated to the client, preferably in writing, before or within a reasonable time after commencing representation); 1.5(c) (stating a contingent fee agreement must be in writing signed by the client and must state the method by which the fee is to be determined); 1.5(e) (requiring a division of a fee between lawyers who are not in the same firm be in proportion to the services performed by each; agreed to by the client, including the share each lawyer will receive; in writing; and for a reasonable total fee); 1.8(e) (forbidding the provision of financial assistance to a

client in connection with a pending or contemplated litigation except in certain circumstances); 1.16(d) (requiring a lawyer take steps to protect a client's interests upon termination of representation); 3.2 (expediting litigation); 3.4 (fairness to opposing counsel and parties); 4.1 (truthfulness in statements to others); 8.4(d) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); 8.4(e) (engaging in conduct prejudicial to the administration of justice); 8.4(f) (stating or implying an ability to influence improperly a government agency or official or to achieve results by means that violate the Rules of Professional Conduct or other law), RPC, Rule 407, SCACR, and Rule 402(h), SCACR (the lawyer's oath).

Respondent further admits her conduct constitutes grounds for discipline under Rule 7(a)(1), (5), and (6), RLDE, Rule 413, SCACR (violating the Rules of Professional Conduct; engaging in conduct tending to pollute the administration of justice or bringing the courts or the legal profession into disrepute or conduct demonstrating an unfitness to practice law; and violating the lawyer's oath).

## Conclusion

We accept the Agreement and disbar Respondent from the practice of law in this state. Respondent shall pay the costs incurred in the investigation and prosecution of this matter by ODC and the Commission, or enter into a reasonable payment plan with the Commission, within thirty (30) days of the date of this opinion. Within fifteen (15) days of the date of this opinion, Respondent shall file an affidavit with the Clerk of Court showing she has complied with Rule 30, RLDE, Rule 413, SCACR (duties following disbarment), and shall surrender her Certificate of Admission to the Practice of Law to the Clerk of Court.

**DISBARRED.**

**BEATTY, C.J., KITTREDGE, HEARN, FEW and JAMES, JJ., concur.**